Your Honor, my name is Wanda Stewart. I'm here representing Idaho's Governor, Governor Otter. Also at council table with me are Scott Sanzig and Steve Olson from the Idaho Attorney General's Office representing Ada County Clerk Rich and intervener, the State of Idaho. Together, we have agreed that I will use our sides 30 minutes. And with your leave, I will reserve five minutes of that for a reply. Thank you. Right at the outset, Your Honors, I want to make one point. Idaho has a good reason that satisfies any level of scrutiny for its decision to preserve man-woman marriage and therefore necessity to not include same-sex couples in marriage. That good reason is this. The man-woman meaning at the core of the marriage institution generates and sustains the child's bonding right, which is a social expectation, a strong social message, a social promise and norm that to the greatest extent possible, a child will know and be reared by her mother and father, the two people who brought her into this world and whose family and biological heritage are an important part of her very being. The different kind of marriage that Idaho law and society must implement if same-sex couples are to marry undermines and weakens that social expectation of the child's bonding right. We deem this interest compelling, that is, the child's bonding right, because for the vast majority of children, those that result from a man-woman relationship, when the child's bonding right works, they have better... What is the word you're using before right? Bonding right? Bonding, B-O-N-D-I-N-G. Go ahead. Children, generally speaking, flourish and thrive. There's a greater level of human flourishing. When it is not honored, when the child's bonding right is not honored, the reality is, for virtually all of the children of whom I am speaking, and indeed for whom I am speaking, those resulting from a man-woman relationship, when the child's bonding right fails for them, there is no loving, committed lesbian couple or gay couple there to provide them with wonderful parenting. When that happens... Your burden here, though, is to demonstrate why allowing other relationships than the ones you regard as optimum interfere with the ones you regard as optimum. I accept that burden, Your Honor. And here's the answer. Here is the social mechanism. And let me make something clear, if I may, right now. We're talking predictions here. Idaho has an imperfect crystal ball, as do plaintiffs, as necessarily does everyone else involved with this issue. So Idaho is doing its best judgment on these predictions, but here's what it's quite confident about. Institutions send powerful messages. The more powerful the institution, the more powerful the message. There's hardly a social institution in our society more powerful than marriage. Historically, the powerful message it has always sent is the one I've been talking about, the one that says to heterosexual men and women, and particularly to the fathers, and we can come back to that. The heterosexual men and women aren't going to enter into same-sex marriages. So what's the issue? The issue is that the powerful message given by the man-woman marriage institution is simply that you need to create an enduring, stable bond for the benefit of the child or the children you together bring into this world. That has been the case. And why isn't the model of having same-sex marriage and children reared in same-sex marriages, as opposed to reared outside of marriages, supportive rather than unsupportive of that message, i.e., the children need stable, loving parent relationships? Because the only way a same-sex couple can be married in any jurisdiction, in any meaningful or intelligible way, is for the state to withdraw its support for the man-woman marriage institution and that core man-woman meaning and implement something new and very different, and that is genderless marriage. Well. Genderless marriage. Yes, I know the phrase in your brief. One of the things that occurred to me, I was very interested in the briefs that talked about the history of marriage in general and the degree to which there were sort of gendered relationships that there were. And it appeared to me that, in many ways, most of that has, because it's essentially sex-discriminatory and prescriptive, has disappeared either as a matter of constitutional law or as a matter of statutory and historical changes. So what is the actual difference between the current model of marriage, which is essentially genderless in many ways, in most ways, and what it is that you claim is going to be substituted for? What's going to be substituted for, Your Honor, in Idaho's understanding and view is a message, a social message. First, that fathers are not a necessary part, an important part, a valued part, of the child-rearing endeavor. And the same message with respect to mothers. When you change the meaning of the institution, you change its message to everyone, everyone, because this institution teaches everyone and in a powerful way. If the message is strongly enough given, long enough, that fathers, and let me focus on that just for a second, because as you understand, in the nature of things, father-child bonding has always been a bigger problem for society than has mother-child bonding. So focusing on fathers, when the message is, fathers as fathers are not valued or necessary, do not even have a space for their status and role in the law, then it is Idaho's sensible prediction that over time, the men socialized by that new and different marriage institution, genderless marriage, will weaken in their commitment to abide by the child's bonding norm. Hence, an increase in fatherlessness with all of its attended ills for the large majority of children, those resulting from man-woman relationships. What is the national percentage of children who are reared in the families that you are? What is the national percentage of children who grow up with their biological parents throughout childhood in a marriage? I can tell you the answer for Idaho. The marriage institution is very strong in Idaho. And as a consequence, especially for younger children, Idaho is right at the top in terms of honoring the child bonding right. It's still not that high, is it? Oh, I think it is. I'd direct your attention to excerpt of the record 312. This is the affidavit of Dr. Joseph Price. My research indicates that Idaho's demographics, compared to those of all other states, reveal a consistent commitment to the ideal that children will be raised by their own married mother and father. And then he goes through the various nations. I have a question. What's the percentage? The percentage, Idaho is second in the nation in terms of the percentage of children 0 to 6 who live with both their mother and their father who were married since before the child was born, 68%. Yeah, and what's this? And that's only until age 6. I'm sorry, sir? 68% is only until age 6. That's right. But it rises to 70% if adopted children are included. That's also second in the nation. Idaho drops to 58% when you stretch the age to 17, still in the top quartile or even higher. And so having what in Idaho I gather is a very small percentage of same-sex marriages is going to make this huge difference in that percentage. Well, it will, Your Honor, because there are no same-sex marriages. There are no marriages by same-sex couples until Idaho changes the meaning of marriage both legally and socially. We're talking here about two different marriage institutions with two quite different messages that go out to everyone regarding the child's bonding right. Genderless marriage does not sustain but rather undermines that message. That is Idaho's best judgment. And Idaho has a reason to believe. All you're talking about is a message, right? You have almost 3 out of 10 children who by the age of 6 are no longer living this kind of ideal relationship that you pose. The percentages are not going to change very much if you allow genderless marriages. I don't know that you could predict, but what percentage of Idahoans do you think will get married if you allow same-sex marriage? What Idaho is predicting, Your Honor, is that if the message changes over time, the level of fatherlessness in the lives of Idaho children generally will increase.  Massachusetts has come before this Court, along with a number of other States, and has said, in effect, we have looked at the marital conduct of folks who were socialized by the man-woman marriage institution, and it is not that different from the marital conduct of an earlier group of people socialized by the same man-woman marriage institution. No one has given their ---- No. That's a different question. The question is, has it influenced the number of people who get married in Massachusetts? My understanding is no. No, but Massachusetts has not come before us with any data as to what the marital conduct will be once we have a generation that has been socialized by a genderless marriage regime. What strikes me is that this train has left the station in the sense that the changes occurred in American marriages before all this, which is what has led to the interest in same-sex marriage, because when women were not able to own property and had to do everything their husbands said and so on, you had a different institution, but that was the core of the same-sex ---- of the heterosexual marriage tradition to begin with. Once all of that changed, yes, the number of people who had children in marriage went down considerably, and that may be a bad thing, but it doesn't seem to have anything to do with this. I do not disagree with all ---- at all with what you've said, and you're echoing Professor Cott, but she has said that there have been important and substantial changes in the American marriage institution. But the point is there has not been a change. There has not been a change, and especially in Idaho and a few other states like it, there has not been a change in this core message that goes out. Men, if you're going to create a baby, society expects you to get into an enduring, stable relationship with that child and the child's mother. And that's an important message, and if that message is absent, and genderless marriage doesn't make that message, if that message is absent, I think it's illogical to believe that there is going to be anything other than an increase in the level of fatherlessness in the lives of the cohort of children on whose behalf I'm speaking. Of course, male same-sex marriages often do have the father present, so what's the issue? Sure. And do not have the mother ---- a mother present. So there the ill is one of motherlessness. I understood what you were saying a few moments ago regarding the changes in sex discrimination law, but when you're talking about father and mother, you're right to bear, excuse me, the basic biological facts. But of course, a lot of that evolving law has precisely to do with this, right? It was a change ---- it was a declaration that whatever model you may ---- somebody might prefer, it cannot be imposed because of sex discrimination. So, for example, you can't in Weinberger v. Wiesenfeld have ---- pay mothers but not fathers to stay home and raise their children. And you can't under Phillips v. Martin Marietta not hire mothers because the mother should be home with the kids and many, many other cases. Yes. But Idaho, in preserving man-woman marriage, is not dictating or commanding or even encouraging any particular sexual assignment. That is for the negotiation between the husband and wife. Well, a lot of these things, at least I don't remember if it was from you or from Meekes, was this complementary marriage notion, child rearing notion, which is exactly  It's exactly the same thing, isn't it? Well, I think that goes to the issue of some fundamental differences in the parenting modes of men generally compared to women generally. Which is exactly the kind of prescriptive gender roles that all the sex discrimination law for 40 years has been unraveling. Well, I think one can accept that only if one accepts a rather radical social constructivist theory of gender, which is highly contested. The Supreme Court has not accepted it, indeed has rejected it. So I think at the level we're talking about, when you're down at the level of man-woman, mother-father, you're not talking about the kinds of problems that our law has been attending to for a number of decades in the sex discrimination arena. Idaho does not prescribe roles or stereotypes. Assume that the male-female marriage is preferable. It's certainly not preferable for the people who are not attracted to people of the same sex. Those people have a right also to live their lives as human beings. To say that those people should not be allowed to fulfill themselves because it sends not the kind of message that you would like to send. What about divorce? Does Idaho prohibit divorce because it sends a bad message to people that males and females should maintain the type of home that you believe sends the best message? No. Idaho to its growing regret. Doesn't that do more damage to the ideal that you profess? Idaho should be telling people that they ought to be a home with the mother and the father and the child. But still, we permit. What's the percentage rate of divorce in Idaho? A good question. I don't know, Your Honor. But when Idaho, along with the 49 other states, got on the no-fault divorce bandwagon back in the late 60s through the 70s and into the early 80s, they did so because they thought they were going to be helping a small group of children, those in high-conflict, irremedial marriages. And they accepted the promise that there would be no adverse impacts upon all of the other children. Idaho has now learned that there was. And Idaho has now seen. The reason there was was because with that change in the law, Idaho law itself damaged a core important meaning of the marriage institution, namely permanence. And once the permanence meaning was gone, we lost the social expectation and social norm that, hey, dad, hey, mom, you stick around. Why don't you then change the law against divorce in Idaho? They may. Which would undoubtedly have more of an effect than the law you now want to do to prohibit gay marriage. Well, I have to respectfully disagree with you in terms of the magnitude of the effect. We think that Professor Helen Alvare got it right. When she talked about this, she said that was a blow, no doubt about it. But pulling the man-woman meaning out of marriage and going with genderless marriage will be the coup de grace. We think the effects will be much more severe in terms of increasing the level of Except the divorce is direct. This is totally indirect, hypothetical, airy, theoretical. Well, we think not. We think the no-fault divorce reform, if you want to call it that, is powerful evidence that when the law changes the core meaning of the marriage institution Because it let people get divorced, not because it was sending messages. No, it did send a message. It sent a message that society no longer values highly permanence in marriage because what society said through its law was either one of you can walk away from this marriage any time for any reason. It's all up to you. It comes down to your own personal choice and nothing else. That's antithetical to the norm, the social expectation, the message of permanence in marriage. Idaho has learned a hard lesson from that, and it doesn't want to repeat it, and it's not accepting it. It's not hard enough to cause it to change what the rules are in Idaho. With respect to divorce. With respect. One thing. I think there's been one. Excuse me, sir. Go ahead. Go ahead. Thank you. I think there's been one advantage to this intense intellectual endeavor that so many of us have been engaged in now for more than a decade. It's gotten people thinking seriously about the no-fault divorce reform, and there's already starting to be movement away from it in some states with covenant marriage and things of that nature. Has any state repealed the right to divorce? Not yet, but that's not a prediction. That's coming. Let me just say this. Because Idaho injured the marriage institution once, no one should suggest that it thereby forfeited its right to say no to what it sees as another injury. Well, except for the difference being that with regard to no-fault divorce, you weren't using another group as a scapegoat for a message. We are not doing that. Well, just a minute. Including the children of those marriages who are being harmed in order to have two parents in a stable – who would potentially be in a stable relationship and would potentially have the financial and other benefits of marriage. And essentially your thesis is to deny those children – leave aside the parents for the moment – those benefits in order to send some vague messages to other people. Your Honor has hit it right on the head. Idaho has in front of it two sticks. Every state, New York, every state has in front of it two sticks. One end of the first stick says Idaho will preserve the man-woman meaning so as to continue to sustain the child's bonding right. The other end of that stick, the negative end, says Idaho will not change its laws to allow same-sex couples to marry and therefore will not be letting the children of those couples have married parents. That is a painful negative end of that stick. But the second stick, the second stick, the one New York picked up, the second stick says at the positive end New York will honor and celebrate the marriages of same-sex couples. We will recognize them. There will be equal dignity there for them and their children will have the blessing and benefit of married parents. But the negative end of that very same stick, that second stick, is simply this. New York is withdrawing all public and official support for the child's bonding right and, indeed, it's sitting there. No, no, not at all. In fact, the children who are in those marriages are getting all the benefits of marriage as are their parents. They're not withdrawing any stick. They are the negative end of New York's stick. The second stick is there because the meaning of marriage has been changed. Meanings matter in this arena. And, you know, do we all hope that the level of fatherlessness does not increase in the state of New York? Absolutely. Anybody who loves children is hoping that the level of fatherlessness, the level of motherlessness, decreases rather than increases because the social sciences are replete with the pain and the heartbreak and the wasted human potential that comes when that occurs. It's an assumption of your argument that children who are raised in a stable same-sex relationship from birth are worse off than children who are raised in the 30% of the houses in Idaho in which by the age of six they are not with their biological parents. Everybody who loves children, and that includes Idaho, is evidenced by its birth rate.  It's an assumption of your argument that the level of fatherlessness,  are replete with the pain and the heartbreak and the wasted human potential that comes when that occurs. It's an assumption of your argument that the level of fatherlessness, they're not going to have inheritance rights, et cetera, et cetera. That's because Idaho has concluded that the price is too high. The price is too high for switching to a radically different meaning at the core of marriage, one that Idaho sensibly, rightly believes is going to over time result in a higher level of fatherlessness and indeed of motherlessness. That's a high price and that's a hard decision. We're not denying how tough this decision is. The Idaho legislature debated this through three sessions and it finally went to the people and they debated it and through democratic processes they made that decision and they picked up the first stick. The folks in New York did the same thing and they picked up the second stick. We're going to learn. You're down under your five minutes. Then I'm going to be quiet and sit down because I would like reply. Thank you. We'll give you your full five minutes. I appreciate that. Thank you. May it please the Court. My name is Deborah Ferguson and I'm here on behalf of the plaintiffs. Idaho has the most sweeping and draconian same-sex marriage ban in the Ninth Circuit enshrined in its constitution. It intentionally excludes an entire group of people from the freedom to marry, not to further a compelling or even a legitimate goal, but simply to treat them unequally. It nullifies all same-sex marriages from out of state at its borders and in its constitution it goes even further and it bars the possibility of any form of relationship recognition for same-sex couples, relegating them to a permanent second-class status. I'd like to turn to the fundamental right to marriage and then discuss the equal protection both as sex discrimination and sexual orientation discrimination. Idaho's marriage ban violates the fundamental right to marry and, if married in another state, to remain married to the one unique person with whom each has chosen to build a home and a family and a life. And where a fundamental right is at issue, as it is here, the Court must apply strict scrutiny, ensuring that that law is closely tailored. How much do you ultimately think it matters, what level of scrutiny? And I mean really, not just, you know, at any level of scrutiny. I mean, how much honestly doesn't matter? To allow same-sex couples to marry? No. I mean, in terms of your argument, what level does the level of – how much does the level of scrutiny matter and down to why? I mean, in other words, where would – at what level would it matter? The State's arguments fail even the lowest rational basis. I knew you were going to say that, but I want to know really. But I know I believe that with great sincerity. They do, because there is no logical nexus here. Allowing same-sex couples to marry will benefit them and the dignity of those children. But if we really applied traditional rational basis, really replied, don't you have a problem, as opposed to the form that was talked about in SmithKline, for example? Well, we can look at the rational – Romer was a rational basis case. Yes. No. It was more kind of – I mean, we're sort of getting to a slight – that's why I'm asking, down to what? I mean, suppose we were to do rational basis the way the Court tells us we should do it, i.e., to remove every possible reason and give every possible deference to the legislature and so on. I think it fails that test. Do we have a level of scrutiny in this circuit? Yes, we do. We have. Are we bound to follow that level of scrutiny? Well, I would think that SmithKline, on the basis of sexual orientation, you know, is a heightened level of scrutiny, which would certainly be applicable to this case. It might seem that way. Yes, it does seem that way. I would suggest, though, further that the State's justifications for banning same-sex marriage, the harms are so egregious if we look to the purpose and effect of these laws. And there just is no rational, logical conclusion to think if the State wants to encourage this male-woman marriage or gender complementarity, that sounds just like sexual stereotypes, gender stereotypes. Well, he didn't, probably for that reason, did not get up here and argue that. What I asked him about it, he was willing to buy into it, but it isn't what he was standing up there and telling us. Well, I think the justifications that I heard are focusing, as they were on the briefs, on parenting and on children. And it certainly fails on that basis. The defendants fear that this will be the fall of the institution of marriage. You know, it hasn't occurred in the 19 states that allow same-sex marriage here, in California, in Oregon, in Washington. And I think that they're defining this as a same-sex marriage. How does Idaho pass a statute that said, we don't really know what the impacts of this is yet, and they could be bad, so we're going to wait 10 years, and we're passing a 10-year law. And in 10 years, we're going to come back and look at the actual numbers in the actual States, and then we'll make it. But then maybe you can change it then. But we don't – our rational basis is we don't want to rush into this. Well, it certainly is not. And it's not – it has no plans to progress in that direction. I understand. I know. But functionally, that's true. In 10 years, they could change it. I think you could – I think if you're talking about a fundamental right to marriage, which we are, it has such grievous harms for the families and the children involved, it would be difficult to say to all of those families and children and couples, we need to be cautious for the sake of caution, for no other reason. We have no evidence that – and it's – part of the logic really falls in that opposite-sex couples aren't marrying and having children and staying together because of what same-sex couples are doing or not doing. Are you saying that if it's a fundamental right and we're doing due process, that you need a compelling reason and that a compelling reason is not speculation that maybe we'll learn something after 10 years? That's absolutely correct, yes. The – Are you arguing fundamental right independently or as a component of an equal protection right? Independent, Your Honor. I think it stands independently as a fundamental right, in addition to our equal protection arguments on the basis of sexual orientation and sex discrimination. But I'm asking you something else, which is – I mean, there's another version of the fundamental right, which is fundamental right is being effected rather than having to stand by itself, and therefore, leads to strict scrutiny for equal protection purposes. That's different than saying, as I understand it, maybe I'm wrong, that the fundamental right itself is enough, you don't have to look at anything else. Well, I think that the law is unconstitutional on all three bases. I mean, as a – certainly under the equal protection argument, but also standing as a fundamental right to marriage. But isn't the problem with the fundamental right argument that it becomes totally circular, i.e., the response is, well, the fundamental right is to a man-woman marriage, and then you have to decide that, and then we're in the middle of a great skepticism about the creation of new or expansion of fundamental rights. Why get into any of that? Well, certainly, the constitutional ban could be struck down on equal protection grounds alone, and the Court doesn't need to engage a fundamental rights analysis. Because in order to get into the fundamental right analysis, you basically have to decide the case, i.e., whether or not the fundamental – the right to marriage stops at man-woman marriage or goes beyond it and – and without any feat, whereas if you get into the sexual orientation or sex discrimination issues, you're talking a broader range of considerations. In other words, you're leaving out in the fundamental rights analysis, it seems to me, a lot of the harms, for example, to the children and a lot of other things that are relevant here in considering where this ends up. Well, and the – you know, the Supreme Court has held that marriage is a fundamental right for over 90 years, and when you look at Zablocki and Turner and Loving, it wasn't breaking those marriage – Even Loving only got to it as a add-on. Well, Loving was decided both as a fundamental right and an equal protection case. I mean, the – Do you really care whether we decide it on fundamental right or equal protection as long as you win? No. Well, we'll have to figure out if you win how much it's fundamental right, how much it's equal protection, how much it's level of scrutiny. And we can try to follow all the doctrines, even if the Supreme Court doesn't and doesn't make it very clear what its basis is. And as Judge Posner did in his latest opinion, didn't really let you know which one of the doctrines it was. But I think that's our problem, whether we want to make it on both doctrines, one doctrine or no doctrine. And you would like us to make it on either one or both, I assume. Yes. I think the due process and the equal protection arguments are both very important and they're very related. And so certainly – and I think that this case, the Idaho case in front of the court, presents both of them squarely to the court. So we would – we would like to see the court decided on both of those bases. The – I think the harms are a very important part of this case. And I'd like to just take a few minutes to discuss those and that the law imposes a cradle to grave discrimination on same-sex couples and their families in Idaho. It pushes them outside the common language of family life that most of us take for granted. And the children of gay and lesbian parents in Idaho, unless they have a second-parent adoption, which is a cumbersome, expensive, intrusive procedure, don't have two legal parents to protect them. And, you know, as my opposing counsel had said, Idaho is sending a powerful message. And I suggest that that message is Idaho's refusal to allow their parents to marry or to have their legal marriages recognized or, in fact, refusal to allow them any form of relationship recognition tells those children that their parents' marriages are not worthy of respect and acknowledgment, which is indeed a very harsh message. And in addition to the message, there is the very real harms of the financial difficulties this imposes upon these families that sweep from these parental rights that we're discussing to property rights, inheritance rights, you know, the full gamut and something as mundane as paying taxes. And although it seems absurd, a same-sex couple in Idaho married out of state must submit to the state of Idaho not two income taxes, their federal and state joint return, but instead five under the fiction that they're not married. And these harms continue to their death and beyond their death. The Idaho Veterans Cemetery refuses to marry, to bury together or to commingle the ashes of a Idaho veteran married to a same-sex spouse under the theory that, well, they're not married and it refuses that their marriages must be ignored and they have to be treated as legal strangers to one another, even after their death. And the discrimination is based solely on their sexual orientation or also sex discrimination on the basis of their sexual orientation, and it deeply offends our federal constitution. I'd like to turn to the sex discrimination in that the same heightened standard of review that applies to sexual orientation and discrimination applies to the sex discrimination. Well, possibly a higher one. I mean, Smith-Kline never really says exactly what the level is, and we know with some more specificity what the sex discrimination one is. That's true, yes. Yes. And I would submit that here the plaintiffs are also being subjected to sex discrimination because viewed from what's happening from their own individual perspective, they are being discriminated against based upon their own sex in the eyes of the individual. And by that I mean our plaintiff, Andrea, can't marry Sheila, and if Sheila was Samuel, she could. So it's imposing sex stereotypes about the proper roles of men and women in marriage. And, Judge Berzon, as you ---- Both sexual and otherwise. Yes, and otherwise. But these roles of the proper, these genders there ---- But the thing that strikes me about the case law, which sort of mystifies me about the case law, is that there's been a great resistance to this notion. And I understand it in instances like Smith-Kline because there you're ---- this ---- it's fairly attenuated to explain why that's sex discrimination or that it's sex. It's not even clear that it is. I mean, it's really we don't like the kind of people who do this. It's more a status sort of thing. And so it's really about we don't like homosexuals. And then you could spit it out and say, well, that reason we don't like them is because of a sex-related issue. But this is directly about whether, you know, who somebody can marry. And it's directly a discrimination based on sex. And, moreover, it buys into sexual stereotypes and is a derivative of a sexually stereotypical institution, which has to some degree unwound in recent years, the sex stereotyping part of it, leaving this and almost nothing else. So but my question is, why is it that the case law, you know, although largely uniform otherwise, has not been comfortable with this approach? Perhaps it's because this is so pervasive that we're not seeing it as sex discrimination. Your Honor had noted that in, you know, the restrictions and the gender roles that were in the past assigned in marriages where women had certain roles and the whole laws of coverture and were subordinate to their husbands in marriage no longer exist, and marriage is now gender neutral. And in light of that, there doesn't seem to be any rational reason than that for that if a person can't, you know, choose a life partner and have that relationship officially acknowledged and recognized of the same sex, since we don't have particular roles for men and women in marriage. There have been three recent Ninth Circuit administrative employment decisions that have found both sexual orientation discrimination and sex discrimination. And while, of course, they're not finding precedent on this Court, I think that they are well-reasoned and persuasive on this issue of sex discrimination in this context of same-sex marriages. Okay. The – when we look at the justifications, you know, in going back to – or I should say turning to the sexual orientation discrimination, the justifications that the State has advanced here are – were primarily focused on children and children. And the Supreme Court found that the marriage of children for the children arguments, they're also completely absent from the legislative record. There is no for the children argument that was found in the – in the legislative   underscoring that this is a post-hoc rationalization in response to litigation, the children argument. The State's – But then there's the whole other problem of the fact that man-woman marriage is not limited to people who have or could have children. Yes, clearly. And has ramifications for those people, including inheritance and other taxes and everything else they get. And indeed, historically, those issues, i.e., inheritance and so on, were quite important. The ask between the spouses, leaving the kids out of it. Right. Which for same-sex couples, you know, who – I mean, all of those rights are – would be deeply important. And in Idaho, under the state constitution, of course, as I mentioned earlier, it bans same-sex marriage, recognition of out-of-state marriages, which two of our plaintiffs were married out-of-state, one in California, one in – another couple in New York. And it also – I mean, it goes further, and I think this really gets to the, you know, the purpose of this law. But it goes even further to say you can't be married, we won't recognize your marriage, and no form of relationship recognition, be it a domestic partnership or civil union, nothing can be recognized in Idaho. And I can't – it's difficult to – it is not rational, and it does not in any way advance those bonds between opposite-sex couples to one another or to their children by excluding and harming same-sex couples and their family in such a profound and comprehensive manner. Do you disagree with the basic argument that the approving same-sex marriage disadvantages the basic structure of marriage and sends a message that heterosexual marriage is not as important to society as Idaho appears to think? I profoundly disagree that it has an effect. You don't think it has any effect on the message of bonding between a mother and a father and a child, and that structure being a better structure for society? I don't think it has any effect on that. I don't think that – So this is the question. Well, no, I just asked her a question. I thought you did ask her a question. That's the question at the moment. She said she doesn't think it has any effect. Well, I don't see the marriage of opposite-sex and same-sex couples as these different regimes that are being portrayed by the State. I don't – my clients are looking for the opportunity to participate in traditional marriage, to marry and have that very intimate adult bond and protect their children in that fashion. So, no, and I don't think that opposite-sex couples are looking to see what same-sex couples are allowed to celebrate and have those very personal bonds, that it's going to serve as a disincentive for them to marry or to have children or stay together with their children. But the question is whether if Idaho, the State legislature, thinks otherwise. Now, you suggest that they've never said otherwise. The legislature is – it's all post hoc, but suppose they went back and they, you know, wrote some whereases. And what – does any empirical proof matter here? I know that you – this is where I interrupted before and shouldn't have, but you were saying, I think. The question is, does what you think matter, or does Idaho – is there either some goal, legislature-think-matters-what-matters on this point? Well, I think – no, I misspoke. The – if we're looking for justifications and we're looking at a rational basis and we're looking back at legislative history to understand what was the purpose of the legislation, there is – we see nothing about this for-the-children rationale. But they could fix that. It would still lack – even if you tried to fix it with some whereases and for-the-children, it still has a fundamental disconnect. There's a logical disconnect that isn't there because you're imposing a great harm on an individual with very unusual type of discrimination to impose this harm and for no benefit. We don't see why this is and how this is going to increase heterosexual couples in – draw them into marriage or to stay married. If the – does the Court have further questions? I have no questions, thank you. I would say in closing that the plaintiffs who sit here before you today have been denied by the State of Idaho the human dignity and extraordinary significance of the status of marriage that the Supreme Court has held is of immense importance. It's denying the unmarried plaintiffs the right to choose their life partner and enter into the most important adult relationship, denying them the status of marriage. And it strips the married plaintiffs of their – without estate marriages and nullifies them of this fundamental right. And this is really one of the most severe forms of state interference with a marriage and with a family. This state-sanctioned discrimination is based on their sexual orientation and their sex, and it denies them a fundamental right, violating the basic guarantees of the Fourth Amendment of the U.S. Constitution. So we ask the Court to uphold the district court's decision striking down Idaho's same-sex marriage ban and correcting this grave injustice. Thank you. I'd like to pick up where Ms. Ferguson ended, in terms of the questions, and that's the crystal ball issue. Idaho respectfully submits that its crystal ball is probably better than the plaintiff's crystal ball, and at the risk of – well, it will become obvious in a moment what the risk is – I'm going to say it. Idaho has reason to believe that its crystal ball is even better than this Court's crystal ball, and that is because Idaho's crystal ball is based upon the collective wisdom, common sense, experiences, judgment of a majority of its people. That is the genius of the democratic process. Is Ms. Ferguson right that there isn't a legislative record as to the purposes or as to the child protective purpose? I ask Clerk Benson if he would hand to you this excerpt from the – this page from the excerpt of the record. It is ER 209. I believe he also shared it with counsel. This captures, at the level of regular, common, ordinary folks, this great contest between two very different messages. The message that the Man-Woman Marriage Institution powerfully conveys – although I'll admit it's a weaker message now than it was in my youth – still, it's valuable. That's a different message from the message that genderless marriage sends. I'm sorry. Is that an answer to my question? I think it does, yes. Oh, in the legislative history? You mean in front of the legislature or in front of the electorate? Maybe you could just read the part of the message that you say – could you read the part of the message that the poster conveys? Yes, I'm sorry. We have a picture of a young girl about 12, 14 months holding the hand of what must be her mother and the hand of what must be her father. Which is unnecessary? A father or a mother? Vote yes on Idaho's marriage amendment. And then it gives the reasons why you should do that, what the marriage amendment will do and what it will not do. And this picture really conveys a thousand words or more. This is a contest between two different messages. The message of man-woman marriage is, men, you're valuable and important in the upbringing of the children you bring into this world. Women, you are valuable and important in the upbringing of the children you bring into this world. Genderless marriage does not send that message. Indeed, it undermines it. It gives no space in the law for the very role and status of father with his parent to play in court. My question, is this a legislative? First of all, the statute that we're talking about, though, was passed by the legislature or passed by initiative? The statute that we're talking about. There are two statutes being challenged and one state constitutional amendment. Okay. The legislature had a hand, of course, in the two statutes, also had a hand in the marriage amendment. Then it went to the voters. In terms of the legislative history, which is what I asked you. I can tell you this. First, I can't pull something from my mind immediately. If you want post-argument attention to that, we'll give it. But I can tell you this, at the very beginning of this civil action, we turned over every stone we could find to make sure that every bit of the legislative history of the challenged laws was put into the record. We did that because we did not want cherry-picking. And so ---- I've just been told that there's nothing in it that has anything to do with this concern. I think that's not true, and we'll be happy to submit, by way of a brief letter, references to the record, the excerpts from the record that do otherwise. But you're saying that the message you have relates to the constitutional amendment, which was passed by initiative. Is that right? This constitutional amendment in Idaho, unlike Nevada, was not passed by initiative. It was referendum. The legislature started the process. By popular vote of the people. Right. And then, of course, the only way to amend the Constitution is when the people vote on it and accept it by a majority vote, which they did with a strong majority vote in 2006 general election. Right. Back to the crystal ball. Idaho has strong, robustly supported legislative facts. Well, take Loving v. Virginia. There were crystal balls there, too. Right? There were competing crystal balls. I think there were not competing crystal balls because the problem ---- Of course there were. I think there were because you were going to have children who were of mixed race and they were going to be inferior and they were going to ---- and so on and so on. There were crystal balls. There were ---- I suggest that there were no crystal balls because the State never advanced a legitimate interest that one then had to figure out. Well, it's one that doesn't sound very legitimate to us now, but they thought they had a legitimate interest. Well, given the history and text and jurisprudence of the 14th Amendment, Loving was no surprise even in 1967. I mean, it had been preceded by Perez ---- But it would have been in 1955, right? Well, it had been preceded by Perez out of the California Supreme Court clear back in 1948. Right. Then why did it take 20 years? Because it was not ---- Well, that's when the case arose, but ---- There were not as many States, but there were a great many States that still had miscegenation laws. There were no legitimate State interests that one had to worry about. None were at stake. White supremacy and anti-miscegenation ---- you know, white supremacy and mixing of the races. Well, there was the judge who said that the God put people on different planets and if you mix them up, terrible things are going to happen. Well, I ---- I mean, different continents. Well, I hope you are not trying to equate those supposed State interests with Idaho's interests here, which I've identified as decreasing the level of fatherlessness and motherlessness for the vast majority of its children. But as to the crystal ballness, though. Yes. Yes. The interest is a legitimate interest. It's the connection that seems extremely ethereal. And the question is, is this more ---- in other words, that's where we're getting to the crystal ball discussion. And Schutte answers that question right at the end of Schutte. Which does? I'm sorry. I didn't hear you. I'm sorry. What case answers it? I didn't hear you. The United States Supreme Court decision a few months ago in Schutte, the case upholding the Michigan voters' decision to do away with affirmative action in higher education right at the end of it. Justice Kennedy, 1238-6. Yeah, 1238-6 in my mind, but that's just my best guess. Justice Kennedy says, the people in Michigan see the latent possibility of adverse consequences. And, you know, that is a subject for debate and discussion. As people decide how to form their own society, do they have to make hard decisions? Yes. You know, you take Grutter and Schutte together. Those are both two stick cases also. Each stick with a very positive end and each stick with a negative end. And initially, the Michigan folks picked up stick one. And the Supreme Court in Grutter said, you can. And then the Michigan folks decided, no, we're going to lay down stick one and pick up stick two. And in Schutte, the Supreme Court said, you can. And on this issue of crystal balls, right there at the end of Schutte, Chief Justice, or excuse me, Justice Kennedy said, adverse consequences, that's not a matter for anything other than more discussion and debate in the democratic process. Well, I think you're going to have an opportunity to find out what Justice Kennedy really thinks. And, you know, your speculation about what he thinks about anything may be just as good as ours, but we'll all have to guess until he tells us the answer. Yes, and I just want Your Honor to know that you and I agreed entirely on one point in your Perry decision, and that is, as much as we all like this court, and we do. Which, the Ninth Circuit or the Supreme Court? The Ninth Circuit. Oh, the Ninth Circuit, okay. We all know this is going to be decided one step up. And we all know by whom. The Supreme Court has a way of surprising us all at times, doesn't it? Sometimes pleasantly, sometimes not so pleasantly. Thank you. My time is up. Thank you very much, counsel. The case is arguably submitted.
judges: REINHARDT, GOULD, BERZON